IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CASEY A. GADDY,

*Plaintiff,*

v.

WOOD BROTHERS BAR, INC., et al.,

*Defendants.*

CIVIL ACTION
NO. 24-6529

**Pappert, J.**                                                                 **June 9, 2026**

**MEMORANDUM**

Wood Brothers Bar, known as Woody's, is a bar and club in Philadelphia. Mayfield, known as Voyeur, is an after-hours nightclub. The two are separated by less than a block and share management personnel and staff. Casey Gaddy worked as a bartender at both for roughly five years. His manager, Martin Gillespie, fired him from Woody's after investigating two customers' disputed credit card charges, or chargebacks, and concluding Gaddy was responsible for padding customer tips.

Believing Gillespie refused to assign him certain shifts and then fired him because he is a man, Gaddy, proceeding *pro se*, sued Woody's and Voyeur under Title VII of the Civil Rights Act. He alleges sex discrimination in the form of disparate treatment and retaliation against him for filing an EEOC charge.[1] Defendants moved for summary judgment on all claims.

---

[1]     Gaddy initially alleged gender discrimination and retaliation against Woody's (Count I), retaliation against Voyeur (Count II) and defamation and intentional infliction of emotional distress against Woody's and Voyeur (Count III). (Am. Compl., Dkt. No. 4.)  The Court dismissed the retaliation claim against Woody's and the defamation and IIED claims against both defendants. (Mem. Op. Granting Partial Dismissal, Dkt. Nos. 19, 20.)

1

No record evidence shows Gaddy's sex had anything to do with his termination. And no reasonable juror could find he suffered an adverse employment action from a denial of certain work assignments or alleged retaliation. He speculates about Gillespie's motives and saturates his briefing with immaterial and misrepresented facts, apparently hallucinated by artificial intelligence. The record shows Gillespie fired Gaddy because he concluded after investigating that Gaddy fudged the customers' tips. The Court grants defendants' motion.

I

Customers and staff at Woody's and Voyeur are mostly gay, bisexual or queer males. (Defs.' SOMF ¶ 11, Dkt. No. 49-2.) Some bartenders start work at Woody's and move to Voyeur around 2:00 a.m. when Woody's closes. Voyeur is open until 4:00 a.m. on weekends. (*Id.* ¶¶ 7, 56.) Approximately two-thirds of the bartenders at Woody's and Voyeur are male. (*Id.* ¶ 12.) Gaddy started as a bartender at both Woody's and Voyeur around February of 2018. (*Id.* ¶ 14.) Martin Gillespie and Roy Baldwin supervised Gaddy at Woody's, (*id.* ¶ 16), and Gaddy also reported to Gillespie at Voyeur, (*id.* ¶ 17). Gillespie assigned bartenders' shifts at both establishments. (*Id.* ¶ 54); (Gaddy's Resp. to Defs.' SOMF ¶ 54, Dkt. No. 50-1.)

In 2022, Gaddy worked almost exclusively at Woody's, which has several bars inside. (Defs.' SOMF ¶¶ 130, 181–82.) According to Gaddy, working at Woody's South Bar was "advantageous" because it is "better located"—bartenders there can make "twice as much" money. (Gaddy Dep. at 144:1–12, Defs.' Ex. 3, Dkt. No. 49-6.) Sometime in December of 2021, Gillespie assigned Gaddy to work primarily at the

South Bar, where he was paired with a female bartender, Maria Esser.  (*Id.* at 144:13–145:3); (Defs.' SOMF ¶ 147.)

In May of 2022, Woody's learned two South Bar customers had disputed charges on their credit cards for transactions on April 2 and 9.  (Defs.' SOMF ¶ 149.)  Gillespie investigated the so-called chargebacks and determined they resulted from unauthorized tips.  (*Id.* ¶¶ 151–155.)  Gillespie knew bartenders used shared logins to enter tips, (*id.* ¶ 135), and learned Gaddy, not Esser, was at the South Bar when Woody's closed—on both nights, Esser told Gillespie she had left Woody's to bartend at Voyeur, (*id.* ¶¶ 156, 157).[2]  Although Esser's name was listed on the receipts at issue, Gillespie concluded Gaddy was likely responsible for increasing the tips.

On May 5, 2022, Gaddy and Baldwin met to discuss the chargebacks.  (*Id.* ¶ 166.)  Gaddy admitted to Baldwin "it's possible we could have made a mistake," (*id.* ¶ 173), and later the same day texted Gillespie "I am human and can make mistakes," (*id.* ¶ 174).  Baldwin created an employee separation report stating: "[Gaddy] put false information into the [point-of-sale] credit card system" and "when asked about this act, [Gaddy] did not dispute doing so."  (*Id.* ¶ 176.)  On or around May 8, Baldwin told Gaddy his "services were no longer needed."  (*Id.* ¶ 175.)

II

Federal Rule of Civil Procedure 56 directs a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the

---

[2]    Gaddy improperly disputes these facts among many others.  Federal Rule of Civil Procedure 56(c)(1)(A) requires him to support his assertions or denials with citations to the record.  Instead, he frequently points to irrelevant parts of the record, only partly addresses defendants' assertions of fact or denies "for lack of sufficient knowledge or information."  *See, e.g.*, (Gaddy's Resp. to Defs.' SOMF ¶¶ 135 & 156).

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  This language compels summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A nonmoving party has not made that sort of showing if "the record taken as a whole could not lead a rational trier of fact to find" in the party's favor.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted).

Only a factual dispute that is both material and genuine can defeat a properly supported summary judgment motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A material fact is one that "might affect the outcome of the suit" under the governing law."  *Id.* at 248.  A dispute over a material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Here, Gaddy must identify "specific facts, as opposed to general allegations," in response to defendants' motion.  10A *Wright & Miller's Federal Practice & Procedure* § 2727.2 (4th ed. 2026). He may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Nor can he "resist a properly supported motion for summary judgment merely by restating the allegations of his complaint; rather, he must point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (per curiam) (citing *Celotex*, 477 U.S. at 322).

At the summary judgment stage, the Court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In doing so, the Court construes the

facts and inferences in the light most favorable to the non-moving party. *See*

*Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.,* 258 F.3d 132, 140 (3d Cir. 2001).

Nonetheless, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably

find for the plaintiff." *Anderson,* 477 U.S. at 252.

## III

Gaddy's discrimination claim against Woody's includes his termination and his

manager's alleged refusal to assign him desirable shifts.[3]  Title VII prohibits an

employer from discriminating against an employee based on sex.  42 U.S.C. § 2000e–

2(a).  Such claims are evaluated under the burden-shifting framework in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792 (1973).[4]  Gaddy must first establish a *prima facie*

case of discrimination.  If he can do so, the burden shifts to Woody's to articulate a

legitimate, nondiscriminatory reason for the adverse employment action.  If it provides

such a reason, the burden shifts back to Gaddy to prove by a preponderance of the

evidence that the stated reason was a pretext for discrimination.  *See Burton v. Teleflex*

*Inc.,* 707 F.3d 417, 426 (3d Cir. 2013).

To establish a *prima facie* claim of sex discrimination, Gaddy must show: (1) he

belongs to a protected class, (2) Woody's took an adverse employment action against

him, (3) he was qualified for his position and (4) the adverse employment action

---

[3]    At oral argument, Gaddy abandoned a third claim of discrimination related to Woody's dress code, opting to include his arguments on that topic only to contextualize his other claims.  *See* (Tr. of Oral Arg. at 6:12–23, Dkt. No. 68).

[4]    Although Gaddy mentions the *Price Waterhouse* mixed motive theory in his papers, *see e.g.*, (Gaddy's Resp. to Defs.' SOMF ¶ 121), he presents his arguments within the *McDonnell Douglas* framework, (Gaddy's Resp. in Opp'n at 6, Dkt. No. 50).  He confirmed at oral argument that only the *McDonnell Douglas* framework applies to his claims.  (Tr. of Oral Arg. at 63:22–64:6.)

occurred under circumstances giving rise to an inference of unlawful discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802).

A

As to Gaddy's termination, Woody's contests only the fourth element, the inference of discrimination.  (Defs.' Mot. for Summ. J. at 11–12, Dkt. No. 49-1.)  Such an inference may be supported by, among other things, (1) comparator evidence, (2) evidence of similar, impermissible discrimination or (3) statements or actions suggestive of discriminatory animus.  *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010).[5]

1

Comparator evidence is evidence "the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).  Comparators are "employees [who] dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2001)).  The plaintiff must be similarly situated to the purported comparators "in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011).  Courts consider "factors such as the employees' job

---

[5]    Gaddy moved to compel production of personnel records, among other things.  (Dkt. No. 51.) Defendants satisfied his request by producing complete files before oral argument.  *See* (Tr. of Oral Arg. at 29:17–21, 53:24–54:4, 56:10–14.)

responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Whitmore v. Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 306 (E.D. Pa. 2020).

Gaddy believes two female bartenders, Esser and Chelsea Michaels, are comparators. But neither "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish" them. *Opsatnik*, 335 F. App'x at 223. Gillespie concluded Esser, the female bartender paired with Gaddy when the disputed receipts were created, was not responsible for them. Gaddy criticizes Gillespie's investigation and argues Esser was never seriously considered a suspect. *See, e.g.*, (Gaddy's Resp. to Defs.' SOMF ¶ 156 ("Esser was . . . treated as an ally . . .")). True, after speaking with Esser, Gillespie quickly focused on Gaddy as the person most likely responsible for the fudged tips. (Defs.' SOMF ¶ 156.) But that is immaterial to Esser's status as a comparator. She would be a comparator if Gillespie concluded both had fudged tips, and only disciplined Gaddy, but that's not what happened. Gaddy conflates his comparator arguments with his criticism of Woody's investigation into the disputed tips. *See infra* subsection III.C.1. He claims "Woody's investigated and terminated Gaddy (male) while taking no adverse action against Esser (female) whose checks were implicated." (Gaddy's Resp. in Opp'n at 9, Dkt. No. 50.) All agree the receipts which triggered the investigation bore Esser's name. (Tr. of Oral Arg. at 20:7–11.) But Gillespie concluded Gaddy was responsible for improperly entering tip information into the point-of-sale system. Esser therefore is not a comparator.

Neither is Chelsea Michaels. Woody's "temporarily withheld a large customer credit card tip from Michaels pending confirmation that the tip was legitimate and that

7

the customer who left the tip was not going to make a chargeback." (Defs.' SOMF ¶ 223.) Her conduct is distinguishable from Gaddy's: Woody's paid her the large tip because no customer ever disputed the bill. (*Id.* ¶ 224.) And Gaddy undermines his claim by showing Woody's scrutinized both men and women—after all, Woody's withheld the tip to confirm no customer would challenge it. In any event, Michaels was later fired for pocketing cash customers used to pay for drinks, further weakening Gaddy's claim that women enjoy preferential treatment at Woody's. (*Id.* ¶ 225.)

2

Gaddy attempts to show similar discrimination against four male bartenders: Jaime Paramo, John Woodruff, Jeffrey Williams and Jenson LaVallee. (*Id.* ¶ 199.) He claims "[e]very male bartender who held a position that intersected with Esser's domain departed under adverse circumstance, while Esser continued working throughout." (Gaddy's Resp in Opp'n at 11.) Gaddy's allusion to Esser as an overarching factor in the four men's termination is speculative. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999) ("[A]mbiguous allegations and vague inferences [] cannot defeat summary judgment.") And his suggestion that Esser was somehow bulletproof is belied by the fact that Esser herself was "fired and rehired." (Gaddy Dep. at 145:14–146:5.) Gaddy points to no specific example of discrimination against the four men and admits he doesn't know why they were terminated. *See* (Gaddy's Resp. to Defs.' SOMF ¶¶ 202, 207 (Paramo and Woodruff)); (Gaddy Dep. at 207:1–12, 209:14–17 (Williams and LaVallee)). Indeed, Gaddy concedes Woody's hires "very few female employees" and there can be many reasons a male bartender might have a shorter tenure than a female. (Tr. of Oral Arg. at 78:14–23.)

Gaddy's "[s]peculation and conjecture" cannot not create an inference of discrimination at summary judgment.  *See Wharton v. Danberg*, 854 F.3d 234, 244 (3d Cir. 2017).

3

Finally, Gaddy points to comments Gillespie made on the job, but they create no questions for a jury.  Roughly one week before he was fired, Gaddy claims he asked Gillespie why "Esser was selected over him for work assignments" in reference to a bachelorette party staffed by female bartenders.  (Gaddy's Resp. in Opp'n at 25.) Gillespie told him he preferred to have a woman bartend bachelorette parties and purportedly said "for the dancer shows . . . we can leave the testosterone to the dancers."  He then commented "[Esser is]—you know, women are just better under pressure, you know" and Gaddy "didn't fit the look."  (Gaddy Dep. at 163:13–164:11); (Defs.' SOMF ¶ 121.)[6]

No reasonable juror could conclude from these comments alone that Gillespie fired Gaddy because he is a man.  First, the comments were isolated, the only such remarks Gillespie ever made.  They don't show Gillespie—a man—harbored discriminatory animus against other men.  (Gillespie Decl. ¶ 5, Defs.' Ex. 4, Dkt. No. 49-7); *Punzo v. SugarHouse Casino*, No. 20-5581, 2022 WL 2718610, at *11 (E.D. Pa. July 12, 2022) ("Aside from the fact that this singular comment is vague at best as to its connotations, any alleged discriminatory animus is undermined by the fact that"

---

[6]    Gaddy relies on his own deposition testimony to support these statements, and Gillespie disputes ever saying these things.  A plaintiff's uncorroborated deposition testimony may create a triable issue of fact.  *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990).  But courts are skeptical "when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence."  *Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (quoting *Arrington v. United States*, 473 F.3d 329, 343 (D.C. Cir. 2006)).  Nonetheless, the Court accepts Gaddy's testimony as true and ignores Gillespie's denial that he made these statements.  (Defs.' Mot. for Summ. J. at 13 n.3.)

Gillespie is also a man); *see also Meyer v. State of N.Y. Off. of Mental Health*, 174 F. Supp. 3d 673, 687 (E.D.N.Y. 2016) ("It is a well-settled, albeit not dispositive, principle that where the alleged discriminator is a member of the same protected class as Plaintiff, an inference against discrimination exists and claims of discrimination become less plausible."), *aff'd* 679 F. App'x 89 (2d Cir. 2017).

More importantly, when a plaintiff relies on comments made by a decision-maker to show discrimination, the comments must relate to the adverse decision process. *Ezold v. Wolf*, 983 F.2d 509, 545 (3d Cir. 1992) (recognizing "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight"). Gillespie's remarks were about Gaddy's assignment as a bartender for a bachelorette party, not about his broader employment at Woody's. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) ("What is required is . . . direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision."). Gaddy points to no evidence connecting Gillespie's remarks to his termination, and the comments were "completely unrelated to the investigation" leading to Gaddy's firing. *See Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238, 241 (3d Cir. 2011). Gaddy "cannot rest on mere pleadings or allegations," he "must point to actual evidence in the record on which a jury could decide an issue of fact [his] way." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007). Without evidence from which a factfinder could conclude Woody's fired him because he is a man, Gaddy fails to establish an issue of fact on his *prima facie* case.

B

Even if Gaddy could establish a *prima facie* claim of discrimination, defendants'
burden of articulating a legitimate, nondiscriminatory reason for his termination is
"relatively light" and satisfied with evidence that "would permit a conclusion that it
took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d
at 426 (citation omitted).  They do so here: defendants offer evidence Gaddy was
terminated because Gillespie concluded he was responsible for charging customers
unauthorized tips.  *See* (Gaddy's 5/5/2022 Employee Separation Report, Defs.' Ex. 30,
Dkt. No. 49-33).

The burden shifts to Gaddy to show pretext, which "is usually the determinative
stage of the case." *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 412 (3d Cir. 1999).
To show Woody's stated reason for firing him was pretext for sex discrimination, he
must "point to some evidence, direct or circumstantial, from which a factfinder could
reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)
believe that an invidious discriminatory reason was more likely than not a motivating
or determinative cause of the employer's action." *Burton*, 707 F.3d at 427.  Gaddy's is a
difficult burden. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005).  To succeed,
he must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies,
or contradictions in the employer's proffered legitimate reasons for its action that a
reasonable factfinder could rationally find them unworthy of credence, and hence infer
that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes v.
Perksie*, 32 F.3d 759, 764–65 (3d Cir. 1994).  He "must show, not merely that the
employer's proffered reason was wrong, but that it was so plainly wrong that it cannot

11

have been the employer's real reason." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

1

Gaddy first attacks the quality of the investigation into chargebacks to discredit the reason proffered for his termination.  He criticizes innumerable purported shortcomings of the investigation, arguing among other things Woody's:

1.  Had no "written investigation procedure";

2.  Performed no "handwriting analysis" of the chargeback receipts;

3.  Did not file a police report;

4.  Had "no documented retention policy" for video surveillance;[7]

5.  Conducted "[n]o follow-up interviews with other employees";

6.  Did not terminate or discipline Esser; and

7.  Permitted Esser to work on May 5 after he was sent home.

(Gaddy's Resp. in Opp'n at 16.)

The gravamen of his various criticisms is that Gillespie performed a cursory investigation and too quickly concluded Esser wasn't responsible for the chargebacks. Defendants acknowledge their investigation into the chargebacks was imperfect.  (Tr. of Oral Arg. at 17:20–18:3.)  But "challenges to the adequacy of an investigation" are "insufficient to establish pretext." *Bloch v. Mack Trucks, Inc.*, 240 F. Supp. 3d 365, 375 (E.D. Pa. 2017) (collecting cases).  On May 4, Esser told Gillespie that on April 2 and 9, when the chargeback receipts were entered into Woody's system, she left her post to

---

[7]    Gaddy contends defendants spoliated video evidence from April 2 and 9, 2022.  (Dkt. No. 51.) But the video was automatically recorded over no later than mid-May of 2022, before Gaddy filed his EEOC charge in October of 2022 and triggered defendants' "duty to preserve." *See Painadath v. Good Shepherd Penn Partners*, 348 F.R.D. 16, 26 (E.D. Pa. 2024) (citations omitted).

bartend at Voyeur shortly before Woody's closed.  (Esser Decl. ¶ 27, Defs.' Ex. 23, Dkt. No. 49-26.)  Gillespie concluded Gaddy likely closed the receipts.  (Gillespie Decl. ¶ 86.) Gaddy admits he knew the April 2 and 9 receipts were at issue when he met with Baldwin on May 5.  (Tr. of Oral Arg. at 73:19–23.)  At the meeting, Gaddy did not deny responsibility for a possible "mistake," (Defs.' SOMF ¶ 173), and he cannot overcome his burden at summary judgment by listing ways Gillespie's investigation could have been more thorough, *see Hennessey v. Dollar Bank, FSB*, 833 F. App'x 961, 966 (3d Cir. 2020) ("[T]he courts do not sit as a super-personnel department that reexamines an entity's business decisions."); *see also Arana v. Temple Univ. Health Sys.*, 776 F. App'x 66, 70 (3d Cir. 2019) ("We focus not on what actually happened, but on what the employer honestly believed.").

Gaddy purports to quote *Tomasso v. Boeing Co.*, 445 F.3d 702 (3d Cir. 2006) to support his argument that Woody's "failed to make a reasonably informed decision before taking the adverse action."  (Gaddy's Resp. in Opp'n at 15.)  *Tomasso* contains no such quote, and in any event the case has no bearing on the legal sufficiency of Gillespie's investigation into the chargebacks.  There, the Third Circuit Court of Appeals reversed summary judgment because a plaintiff refuted "core facts relevant to [his employer's] explanation for [his] dismissal" after a reduction in force layoff. *Tomasso*, 445 F.3d at 708 (citation omitted).  The plaintiff showed "implausibilities and inconsistencies" in his manager's low rating of him on a scored evaluation form.  *Id.* (citing *Fuentes*, 32 F. 3d at 765).  The panel concluded the plaintiff demonstrated not only that the "low score assigned by [his supervisor] was 'wrong or mistaken'" but that it was "unworthy of credence."  *Id.*  To reach the same result, Gaddy must "present

evidence contradicting the core facts put forward by [Woody's] as the legitimate reason for its decision." *Kautz*, 412 F.3d at 467.  He has not done so.

2

Gaddy also points to various purported inconsistencies which, he believes, suggest Woody's explanation for firing him was pretext for sex discrimination.  None of his examples "create a factual dispute about whether the explanation was pretextual," nor does Gaddy, as he must, "point to evidence that demonstrates there is reason to disbelieve [Woody's] explanation." *Simpson*, 142 F.3d at 649 n.15.

Gaddy misrepresents the record with respect to several purported inconsistencies.  Factual misrepresentations are a problem throughout his briefing, perhaps a result of his admitted use of artificial intelligence.  (Tr. of Oral Arg. at 51:18–20.)  Gaddy claims Gillespie texted Esser on May 4 "I spoke with [Gaddy], he is not sure of what they are either since they are dated back to beginning of April it is a little hard to remember.  Possible that it could have been a mistake while closing out but again not sure."  (Gaddy's Resp. in Opp'n at 15.)  But Gillespie didn't send that text message—Esser did.  (May 4, 2022 Gillespie-Esser Texts, Defs.' Ex. 26, Dkt. No. 49-29.)  Based on this misattribution, Gaddy argues "[m]anagement's own message—sent to the comparator, not to Gaddy—described the situation as a possible mistake, not a confessed theft."  (Gaddy's Resp. in Opp'n at 15.)  He claims "[a] jury could reasonably infer that Esser was kept informed and insulated while Gaddy was kept in the dark and set up for termination."  (*Id.*)  Gaddy later uses the same text message, this time properly attributed to Esser, as evidence of a "critical conflict of interest" because "Gillespie used Esser . . . as an intermediary source of information during the

14

investigation into Gaddy." (Gaddy's Resp. to Defs.' SOMF ¶ 156.) Gaddy cannot contort the facts to match his theories.

Gaddy also claims Baldwin texted him "I can't believe they are making me do this, the crazy part is they aren't even your tickets." (Gaddy's Resp. in Opp'n at 8.) There is no such text message in the record, although Gaddy refers to it no fewer than five times in his briefing and exhibits. *See* (Dkt. No. 50 at 8); (Dkt. No. 50-1 ¶ 176); (Dkt. No. 50-2 at 2, 16); (Dkt. No. 50-5 at 9). Called upon to explain the fabricated communication, Gaddy now argues Baldwin made the statement to him in person and that, as an issue of form versus substance, it doesn't really matter. (Gaddy's Resp. in Opp'n to Defs.' Mot. in Limine at 4, Dkt. No. 62.) Gaddy's representation stands in stark contrast to Baldwin's sworn declaration that at the May 5 meeting "Gaddy point blank admitted to adding unauthorized tips to customers' credit card purchases." (Baldwin Decl. ¶ 11, Defs.' Ex. 27, Dkt. No. 49-30.) Regardless, Baldwin was not a decision-maker. Even if he made the statement "verbally, in person, at the May 5, 2022 separation meeting," as Gaddy now claims, (Dkt. No. 62 at 4), it is immaterial—neither party disputes the tickets bore Esser's name. The record shows only that Baldwin may have "lamented for [Gaddy's] scenario," from which no reasonable jury could conclude Woody's reason for firing him was pretextual. *See* (Tr. of Oral Arg. at 75:3); *see also* (June 6, 2022 Baldwin-Gaddy Text, Gaddy's Ex. P-2, Dkt. No. 50-5 ("I hate that you gave so much time and energy to this company and they threw you to the curb without a thought")).

Next, Gaddy attacks what he calls "[d]efendants' central alibi—that Esser departed at approximately 1:30 a.m. on [April 2 and 9] and therefore could not have

15

been responsible for the disputed tip entries." (Gaddy's Resp. in Opp'n at 9.)  Setting aside the fact that Woody's does not attempt or need to offer an "alibi," Gaddy continues to invent facts.  He claims Esser texted him "stating that she was coming back to close" on those nights.  (*Id.*)  There is no such text in the record.  Again, Woody's investigation didn't need to be ironclad, nor did their conclusions following it need to be correct.  *Arana,* 776 F. App'x at 70.

Gaddy also misrepresents Woody's president William Weiss's statements during an April 5, 2023 interview about Gaddy's unemployment compensation claim.  (Gaddy's Resp. in Opp'n at 21.)  He claims Weiss "explicitly" stated "we did have [video surveillance] available when he [was] fired." (*Id.*) (cleaned up.)  That is incorrect.  Instead, Weiss confirmed Woody's had "proof of the receipts, slips, and dispute notifications" when Gaddy was fired.  He said nothing about video surveillance.  *See* (Am. Compl. at 46, Ex. P-5, Dkt. No. 4.)

Most of Gaddy's arguments boil down to Woody's not proving beyond all doubt that he, instead of Esser, was responsible for the chargeback receipts.  But that's not the standard.  Woody's has never given a contradictory reason for firing Gaddy.  He fails to adduce any evidence showing "the reason for terminating" him was not "the reason . . . articulated." *Bernhard v. Nexstar Broad. Grp., Inc.*, 146 F. App'x 582, 585 (3d Cir. 2005).

3

Finally, Gaddy attempts to show Woody's stated reason for firing him was pretextual based on Gillespie's response to his "specific question about why Esser was selected over him for work assignments."  (Gaddy's Resp. in Opp'n at 25.)  Gillespie

16

preferred to have female bartenders work bachelorette parties because they were "better under pressure" and Gaddy didn't "fit the look." (Gaddy Dep. at 163:13–164:11.) True, the "temporal connection between the statement and the challenged employment action" makes Gillespie's comments more probative of discrimination. *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997). But courts consider "the purpose and content of the statement," *id.*, "in light of the nature and context in which [it] was made." *Connolly v. Pepsi Bottling Group, L.L.C.*, No. 06-1462, 2008 WL 4412090 (W.D. Pa. Sept. 22, 2008) (citing *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1112–13 (3d Cir. 1997)), *aff'd*, 347 F. App'x. 757 (3d Cir. 2009). The record is otherwise bereft of evidence that Gillespie, or anyone else at Woody's or Voyeur, possessed discriminatory animus toward men. And the comments are unrelated to Gaddy's termination. *See supra* subsection III.A.3. Woody's learned about the chargeback receipts that led to Gaddy's firing *after* Gillespie made the comments in late April of 2022. (Gaddy's Resp. to Defs.' SOMF ¶ 149 ("Admitted that Woody's learned of the chargebacks in early May 2022.")) "[T]he factual dispute at issue is whether discriminatory animus motivated the employer . . . ." *Fuentes*, 32 F. 3d at 765. Gillespie made his comments in reference to a bachelorette party. No reasonable jury could conclude he possessed a general discriminatory animus toward males or that he decided to fire Gaddy because he is male. *See Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) ("[R]emarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent.").

17

IV

Gaddy additionally claims he was denied the opportunity to work certain shifts at Voyeur because he is a man.  As a threshold matter, Gaddy does not dispute the pertinent time period for his claim begins on December 24, 2021.  *See* (Defs.' Mot. for Summ. J. at 19) (citing 42 U.S.C. §§ 2000e-5(e)(1), (f)(1) in reference to the 300-day statute of limitations period associated with Gaddy's October 20, 2022 EEOC charge).  Gaddy alleges he was denied shift assignments: (1) at Voyeur after his regular shifts at Woody's ended and (2) at Woody's for private or public events on special occasions.  *See* (Defs.' Mot. for Summ. J. at 20).  Gaddy has since narrowed his claim.  He concedes there is no evidence of any off-the-record event, (Tr. of Oral Arg. at 81:7–13), and says the events were all during regular business hours, (*id.* at 81:20–23).  He further reduces his claim to extra shifts at Voyeur that Esser was granted but he was not.  (*Id.* at 81:14–19.)

A

Gaddy cannot show an adverse action with respect to extra shifts at Voyeur, so he fails to make out a *prima facie* case of discrimination.  He preferred to work at Woody's on Fridays and Saturdays.  (Defs.' SOMF ¶ 130); (Tr. of Oral Arg. at 80:11–13).  He explained the South Bar was "advantageous" for him because it is "better located"— more customers at that bar translates to more money for bartenders.  (Dep. Gaddy at 144:1–12.)  Indeed, Gaddy only worked at Voyeur twice in 2022, (Defs.' SOMF ¶ 181), following a conversation with Gillespie "about consolidating and only working specifically at [Woody's] South Bar with [Esser]" because "the schedule working at South Bar was particularly a lucrative one.  And the schedule . . . worked well with

[Gaddy] working in real estate." (Dep. Gaddy at 214:18–215:5.)  When Gillespie asked Gaddy if he wanted to work "just at the South Bar and just Friday and Saturday nights," Gaddy agreed because he "got home a little bit earlier" and "the money was good enough, it was worth it." (*Id.* at 220:2–14.)  On the two occasions Gaddy worked at Voyeur in 2022, he wasn't initially scheduled to work there.  Instead, Gillespie had originally assigned him to work at Woody's then "reallocated Gaddy to [Voyeur] based on business needs." (Defs. SOMF ¶ 182.)

Gaddy cannot now claim sex discrimination after previously stating his preference to work a lucrative and more convenient shift at Woody's instead of Voyeur. *See Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 60 (3d Cir. 2019) ("Voluntary resignation is not an adverse employment action.").  And the record demonstrates shift assignments at Voyeur are made without regard to sex.  *See* (Defs.' SOMF ¶¶ 62, 64, 67, 68, 71, 73, 75, 78, 80–82, 84–86, 88–91).[8]

B

To the extent Gaddy still argues he was denied private or public "special event" shifts at Woody's notwithstanding his apparent abandonment of this claim at oral argument, (Tr. of Oral Arg. at 81:15–23), he fails to make out a *prima facie* claim here as well.  First, it is unclear what Gaddy believes Woody's denied him.  The only event he can recall where Woody's didn't staff male bartenders was a single bachelorette party Esser bartended. (Defs.' SOMF ¶ 120.)  He claims "during a shift *when he was working*, Esser was assigned to tend bar for a specific bachelorette party booking [on

---

[8]    To the extent Gaddy believes Esser had more opportunity to take on extra shifts, he cannot "pick out one comparator" he believes was favored "amid a sea of persons treated the same as [him] to establish a jury question." *Simpson*, 142 F.3d at 646.

Thursday, April 28, 2022] while Gaddy was not." (Gaddy's Resp. in Opp'n at 31)

(emphasis added). But that's not true, Gaddy didn't work on April 28, 2022. (Woody's

Time and Attendance Records at 127, Defs.' Ex. 13, Dkt. No. 49-16.) He admits male

bartenders worked private events, (Defs.' SOMF ¶ 119), and even concedes he was

assigned to work special events like a New Years' Eve event, the Mummer's parade, a

March 12, 2022 pub crawl and a black pride block party, (*id.* ¶¶ 96, 99, 103, 108). Cast

against the special events at which Gaddy worked and setting aside his inability to

stick to the facts, missing out on a single shift does not constitute an adverse

employment action. *See Rivers v. Potter*, No. 05-4868, 2007 WL 4440880, at \*7 (D.N.J.

Dec. 18, 2007) ("Courts have found that some conduct may be too isolated and

insubstantial to [constitute an adverse action.]") (collecting cases).

V

Gaddy's final claim is that Voyeur retaliated against him for filing an EEOC

charge when it appealed his unemployment claim.[9] (Gaddy's Resp. in Opp'n at 34.) To

establish a *prima facie* case of retaliation, he must show: (1) he engaged in a protected

activity, (2) Voyeur took an adverse employment action against him and (3) there was a

causal connection between his protected activity and the adverse employment action.

*Moore v. City of Philadelphia*, 461 F. 3d 331, 340–41 (3d Cir. 2006).

Gaddy argues an unemployment compensation appeal "threatening to cut off

subsistence wage-replacement income and requiring a former employee to defend

himself in an adjudicative proceeding" is an adverse action. (Gaddy's Resp. in Opp'n at

---

[9]    Gaddy does not discuss his termination from Voyeur in his response to defendants' motion. (Gaddy's Resp. in Opp'n at 35.) At oral argument he confirmed his intent to limit the retaliation claim against Voyeur to its unemployment compensation appeal. (Tr. of Oral Arg. at 5:13–22.)

35.)  An employer's appeal of unemployment compensation benefits can constitute an adverse action when, for example, the appeal harms future employment opportunities. *Stezzi v. Citizens Bank of Pa.*, No. 10-4333, 2012 WL 4717900, at *4 (E.D. Pa. Oct 4., 2012).  At oral argument, for the first time, Gaddy sought to blame Voyeur for his inability to get a bartender job, only to admit he has no evidence to support that speculation.  (Tr. of Oral Arg. at 84:25–85:8); *see Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir. 1985) ("Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion.")  Gaddy admits he received all unemployment compensation to which he was entitled, (Gaddy's Resp. to Defs.' SOMF ¶ 198), and concedes he suffered no adverse employment consequences, (Tr. of Oral Arg. at 83:12–15).  He fails to establish a *prima facie* retaliation case.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.

21